FILED

2005 Jul-07  AM 09:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **CITY OF ATHENS,** | ) |
| **ALABAMA,** | ) |
| **Plaintiff/Counterclaim** | ) |
| **Defendant** | ) |
| | ) |
| **v.** | )**CIVIL ACTION NO. 5:03-2430-VEH** |
| **CHARTER COMMUNICATIONS** | ) |
| **HOLDING CO., L.L.C., et al.,** | ) |
| | ) |
| **Defendants/** | ) |
| **Counterclaim Plaintiffs/** | ) |
| **Third-Party Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| **RUSTY MONROE,** | ) |
| **MONROE TELECOM** | ) |
| **ASSOCIATES, L.L.C.,** | ) |
| | ) |
| **Third-Party Defendants.** | ) |

## MEMORANDUM OF OPINION

This cause comes before the court on the *Motion for Summary Judgment* (doc.

81), filed by the plaintiff City of Athens, and the *Motion for Summary Judgment* (doc.

91), filed by the defendant Charter Communications Holding Co., LLC ("Charter").

## PROCEDURAL HISTORY

This cause was commenced in Alabama state court on or about July 30, 2003.

The complaint makes four requests for declarations.  In the first request, the plaintiff

seeks a declaration that the Cable Ordinance and Pole Attachment Agreement are valid and lawful in all respects, and that, under the Ordinance and the Agreement, Charter is obligated to comply with all relevant safety standards including the National Electric Safety Code ("NESC") and the National Electric Code ("NEC") . In the second request, the plaintiff seeks a declaration that Charter failed to comply with the Pole Attachment Agreement, the Cable Ordinance, and with provisions of the NESC and the NEC by allowing or creating violations thereof as indicated in the four reports of Russell Bogie.  In the third request, the plaintiff seeks a declaration that the City has a right to terminate the Pole Attachment Agreement.  In the fourth request, the plaintiff seeks a declaration that the City has a right to terminate the Cable Ordinance.

On September 2, 2003, the defendants removed the matter to this court.  In its answer, the defendant Charter asserted seven counterclaims.  The defendant's first counterclaim seeks damages against the City of Athens, Rusty Monroe, and Monroe Telecom under 42 U.S.C.A. § 1983 for deprivation of constitutional rights under the equal protection, due process, and contracts clauses of the federal constitution.  The second counterclaim alleges that the City of Athens' Wireline Act conflicts with Charter's franchise and the federal Cable Act.  In the third counterclaim, Charter asserts a breach of its franchise agreement with the City of Athens.  The fourth

counterclaim asserts a claim for civil conspiracy under Alabama state law and under 42 U.S.C.A. § 1985 against the City of Athens, Rusty Monroe, and Monroe Telecom. The fifth counterclaim asserts a breach of a confidentiality agreement between Charter and the City of Athens, Rusty Monroe, and Monroe Telecom. The sixth counterclaim asserts a claim of misrepresentation against the City of Athens, Rusty Monroe, and Monroe Telecom. The seventh counterclaim asserts promissory fraud against the City of Athens, Rusty Monroe, and Monroe Telecom. Counterclaim Eight alleges intentional interference with existing and prospective business relations and is brought against the City of Athens, Rusty Monroe, and Monroe Telecom.

The plaintiff's motion seeks summary judgment on all eight of the defendants' counterclaims. The defendants' motion seeks summary judgment on the plaintiff's four claims for declaratory judgment and on its eight counterclaims. Both motions are opposed, are supported by submitted evidence, and have been fully briefed. The court heard argument on the motion on March 28, 2005.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for his motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249.

# FACTS

**A.**    ***Background on the City of Athens' Cable Service***

The City of Athens and Athens TV Cable of Alabama, Inc. ("Athens TV"),
were parties to a June 15, 1965 agreement entitled "Agreement For Attachments of
Cables, Amplifiers and Associated Equipment For the Distribution of Television
Signals."  (Pla. ex. "A", Attachment "A" ("Pole Attachment Agreement").)[1]

Under the Pole Attachment Agreement, Athens TV was granted a license to
attach cables and related equipment to the poles owned by the City, subject to a
number of conditions.  Athens TV was required, "at its own expense, [to] make and
maintain said attachments in safe condition and in thorough repair, and in a manner
satisfactory to [the City] and so as not to interfere with the use of said poles by [the
City], or by other utility companies using said poles. . ." (Pla. ex. "A", Attachment
"A", ¶ 1).  Further, Athens TV was required "at any time, at its own expense, upon
notice from [the City],[to] remove, relocate, replace, or renew its facilities placed on
said poles, or transfer them to substituted poles, or perform any other work in
connection with the said facilities that may be required by [the City]. . ." (Pla. ex.
"A", Attachment "A", ¶ 2).  The Pole Attachment Agreement also specified that the

---

[1] Unless otherwise specified, the facts are derived from the affidavit of Dan Williams,
Mayor of the City of Athens, and are undisputed.

"cables, wires and appliances" placed by Athens TV "in each and every location, shall be erected and maintained in accordance with the requirements and specifications of the National Electrical Safety Code, Fifth Edition, and any amendments or revisions of said code or practices and in compliance with any rules or orders now in effect or hereinafter may be issued by any other authority having jurisdiction." (Pla. ex. "A", Attachment "A", ¶ 3).   The poles are owned by the Athens Electric Department ("AED"), an agency of the City.

Through a series of transactions, Charter is the current licensee under the Pole Attachment Agreement, and holds the rights and obligations thereunder.

By Ordinance No. 88-1030, adopted by the City Council in 1998, the City authorized and granted to Athens Cablevision, Inc. ("Athens Cablevision"), a successor to Athens TV, a non-exclusive franchise to provide cable service within the City of Athens for a term of fifteen years.   ("1988 Franchise", Pla. ex. "A", Attachment "B").

Among other things, the 1988 Franchise required Athens Cablevision to "establish, construct, install, operate and maintain" its cable system "in a manner consistent with all laws, ordinances, construction standards, governmental requirements, FCC technical standards and any standards or requirements established by the Ordinance, or by rule or regulation by the City." (Pla. ex. "A", Attachment

"B", Section 9(A)).  Athens Cablevision was further required to comply with a variety of codes, including the NESC and the NEC.  (Pla. ex. "A", Attachment "B", § 9(M)).

Additionally, the 1988 Franchise required Athens Cablevision to provide a $550,000 deposit to the City as security for, *inter alia*, (1) the "faithful performance" by Athens Cablevision of "all material provisions" of the franchise, (2) any "expenditure, damages, or loss" incurred by the City by reason of the unexcused or uncured failure of Athens Cablevision to comply with the directives of the City issued pursuant to the franchise, and (3) the payment of any "damages, claims, costs or expenses which the City has been compelled to pay or incur by reason of any act or default" by Athens Cablevision.  (Pla. ex. "A", Attachment "B", § 6).  The City was authorized to make withdrawals from the security deposit in the event that Athens Cablevision failed to make any required payment upon notice within the time specified.  (*Id*.)

The 1988 Franchise was subsequently transferred from Athens Cablevision to Falcon First, Inc. ("Falcon").  In 1997, Falcon later informed the City that it had rebuilt the cable plant within the City with a new state-of-the-art system.

The City also granted a similar nonexclusive franchise in 1994 to another cable company, known as PCL, allowing it to provide cable service with the City and to

locate its cables and related equipment on the City's poles. PCL is a party to separate agreements similar to the Pole Attachment Agreement and the 1988 Franchise.

### B.   *The Retention of Monroe Telecom Associates*

On or about June 23, 1999, Mayor Dan Williams received a letter from Falcon informing the City that Charter had agreed to acquire the controlling interest in the parent company of Falcon, and that the City's consent to the transaction was being requested. (Pla. ex. "V").

The City determined that specialized assistance would be helpful to the City in considering the issues raised by the transfer request and other cable issues and decided to retain a consultant. By Agreement dated July 26, 1999 (Pla. ex. "W"), the City Council retained Monroe Telecom Associates, LLC, through its principal, Lawrence Monroe, (collectively, "Monroe") to serve as its cable consultant and agent.

In relevant part, the Agreement provided that Monroe would represent the City and "be deemed its consultant and agent" with respect to both the pending transfer request and an analysis of compliance with the terms and conditions of the cable franchise. (Pla. ex. "W", § 2(b)). The Agreement specified, however, that the City reserved "the sole right to make any final determinations and decisions associated with any enforcement actions and any negotiations" and that Monroe would have "no authority to bind or commit" the City. (Pla. ex. "W", § 2(b)).

In communications to Falcon, Charter, and their attorneys, the City identified Monroe and his company as the City's agent and consultant and requested that communications and correspondence be made through him.  (Pla. ex. "X"; Pla. ex. "Q").

### C.    *Consideration of Transfer Request and Franchise Compliance Review*

As part of its consideration of the Falcon-Charter transfer request, the City, through Monroe, requested certain additional information.  By letter to Mayor Williams dated August 25, 1999, attorneys representing Charter provided portions of the information requested.  (Pla. ex. "Y").

One of the information requests asked Charter to "[p]lease identify, and explain. . .what, if any, aspects of the current franchise Charter deems unenforceable, for any reason whatsoever. . ." (Pla. ex. "Y" at 4).  In response, Charter's attorneys replied, "None."  (Pla. ex. "Y" at 4).  When asked if Charter anticipated requesting any relief from the current franchise, Charter responded that it did not.  (Pla. ex. "Y" at 4-5).  When asked if Charter would agree to be unconditionally bound by the terms of the current franchise, Charter replied in the affirmative, stating that "Charter will agree to comply with the current franchise.  In the event a contract or agreement is mutually agreed upon by the City and Charter in the future, Charter will agree to be bound by it."  (Pla. ex. "Y" at 10).

On behalf of the City, Monroe thereafter conducted a review of Falcon's compliance with its obligations under the Pole Attachment Agreement and the 1998 Franchise.  Part of this review involved a detailed analysis of Falcon's compliance with the safety and technical standards imposed by these Agreements.  Between 1999 and 2003, Monroe employed a consultant, Russ Bogie, to conduct a number of inspections of the physical cable system maintained by Falcon.  Bogie's initial 1999 inspections involved both Falcon and PCL (the two cable operators franchised by the City), and his subsequent inspection involved all cable operators operating within the County of Limestone occupying AED poles, including Charter, PCL, Knology and MediaCom.

Following its initial inspection, Monroe provided the City with a Report, dated September 15, 1999, detailing its inspection of the Falcon cable television system in the City.  Mayor Williams forwarded the September, 1999, Report to Falcon communications on September 21, 1999.

Based on his inspection of only a portion of the Falcon system between August 19 and 21, 1999, Bogie detailed 192 instances in which the Falcon cables and related installations were inconsistent with the safety standards of the NESC and NEC, including with respect to subscriber "drops" and grounding, clearance from electric wiring and equipment, and inadequate and unguarded guy wires.  (Pla. ex. "A",

Attachment "C"). The Report also included photographs substantiating the cited violations.

In the Mayor's September 21, 1999, letter to Falcon on behalf of the City, he advised the company that the numerous safety-related violations disclosed in the September, 1999, Report were a "matter of very serious concern to the City Council" which needed to be "eliminated immediately." (Pla. ex. "Q"). Mayor Williams informed Falcon that its failure to maintain its cable system in a safe condition was a violation of its obligations under the 1988 Franchise, and further directed Falcon to eliminate all safety violations concerning its cable system plant within the City within 30 days. (Pla. ex. "Q").

Mayor Williams did, however, invite Falcon to contact Monroe in the event it had any questions concerning the matter, or "to discuss a possible alternative method and time frame for the elimination of all safety violations…." (Pla. ex. "Q"). Mayor Williams also informed Falcon of the City's intent "to withdraw from the Security Fund an amount equal to the City's fully-allocated costs associated with and necessitated by the inspection and any enforcement actions that arise as a result of the identified violations of the franchise." (Pla. ex. "Q").

Upon receipt and review of the September, 1999, Report, neither Falcon nor Charter disputed the existence of any of the violations referenced therein. By letter

dated October 1, 1999, Falcon's Regional Manager communicated his intention "[t]o immediately address and correct all safety violations that we can correct on our own," including subscriber grounding issues, guy guards, and any clearance issues that could be corrected without make-ready work performed by third parties.  (Pla. ex. "Z").  Falcon also advised that an "area by area reinspection" would be conducted to "ensure all corrections are made."  (Pla. ex. "Z").  In agreeing to correct the safety violations noted in the September 1999 Report, Falcon acknowledged both its responsibility for the violations and its obligation to bring its cable plant into compliance as required by the Pole Attachment Agreement and 1988 Franchise.

In October, 1999, the City Council also passed a "Wireline Telecommunications System Law" ("Wireline Ordinance"), which was intended to supplement the existing rights granted to the City under the Pole Attachment Agreement and the 1988 Franchise.  (Pla. ex. "G", Attachment "A").

A copy of the Wireline Ordinance was reviewed by Charter's attorneys prior to its adoption.  Charter's counsel provided the City Council with a twenty page memorandum, dated October 25, 1999, in which various aspects of the proposed law were critiqued.  Since the Wireline Act was enacted, the City has never taken action to enforce the provisions of the Wireline Ordinance against either Falcon or Charter.

By letter dated November 5, 1999, Falcon reported to Monroe its progress in correcting the safety violations noted in the September, 1999, Report, stating that the "only actions remaining to fully address corrective actions needed at this point are make ready issues involving the utilities." (Pla. ex. "P"). A "make-ready-order" is generated when certain additional work cannot be completed without other work first being performed by the owner or other users of the poles. (Scroggins Dep. at 176-77.)

### D.   *Consent to Transfer and Request for Franchise Renewal*

The City Council met on January 31, 2000, and, upon the recommendation of its consultant, consented to the requested transfer of the franchise from Falcon to Charter. (Pla. ex. "K"). The City's consent was contingent on a number of conditions, including that the system be reinspected to verify the elimination of all safety violations "not caused by a third party" and that the security deposit be forfeited if the conditions were not met. (Pla. ex. "K").

On February 14, 2000, the City was officially notified of the acquisition of Falcon by Charter. (Pla. ex. "O"). The February 14, 2000, letter also explicitly confirmed that "Charter agrees to be bound by the terms and conditions of the Franchise Agreement with the City of Athens." (Pla. ex. "O").

On April 28, 2000, City Counsel member, B.T. Gardner, and AED Construction Engineer, James Lannom, met with representatives from all of the companies utilizing AED poles to discuss safety and technical violations summarized in a spreadsheet which was provided to all parties.  In a May 15, 2000, letter to each of the participants summarizing the substance of the meeting, Gardner proposed a remedial plan whereby the party that caused a particular violation would be responsible for correcting that violation at its own cost.  (Pla. ex. "N").  However, the users of the City's poles never reached an agreement.

In or about February, 2000, the City formally requested that Charter reimburse the City for the costs it had incurred by reason of the safety violations discovered in the cable system plant, including costs incurred in conducting the August, 1999, inspection.  By letter dated February 29, 2000 (Pla. ex. "AA"), the City requested that Charter reimburse the City for its share of the costs incurred, $27,359.50, pursuant to Section 6(D) of the 1988 Franchise.  Although the City had earlier proposed imposing a $30,000 fine based on Charter's failure to produce certain financial records, that amount was never assessed nor withdrawn against Charter's security deposit.

PCL also was sent an invoice representing its share of the costs incurred by the City in connection with PCL's own franchise violations.  In response, the City

received both a check from PCL for those expenses and a commitment to correct any outstanding violations.

On May 22, 2000, the City received a formal request from Charter that the parties commence the formal franchise renewal process because the franchise was set to expire on May 3, 2003.  (Pla. ex. "BB").

B.T. Gardner, the City Special Projects Attorney, continued to work with Charter in an effort to resolve the City's request for reimbursement of costs incurred to date.  In a letter to Charter's counsel dated July 25, 2000 (Pla. ex. "CC"), Gardner provided an itemization and supporting documentation for the $36,131.90 in reimbursement being requested and suggested that the proposed $30,000 fine be "tabled" pending further efforts by the parties to obtain and inspect the requested financial records.

On November 27, 2000, the City Council ultimately adopted a Resolution on directing the City Clerk to withdraw from the $50,000 security deposit the amount necessary to reimburse the City for costs it had incurred to date by reason of the franchise violations and to notify Charter of its obligation to replenish the security deposit within fourteen days.  (Pla. ex. "DD").

15

Mayor Williams wrote to Charter on June 21, 2001, to confirm that the City had, in fact, withdrawn its costs incurred to date from the security fund in the amount of $39,542.96.  (Pla. ex. "EE").  Charter objected to the withdrawal.

### E.   *Reinspections of the Cable System*

The City Council authorized Monroe to conduct a reinspection of the cable system to confirm Charter's ongoing compliance with its safety obligations under the Pole Attachment Agreement and 1998 Franchise.

The reinspection was conducted by Bogie between December 14 and 17, 2001, and resulted in a "Report on the Reinspection of the Charter Communications Cable Television System in the City of Athens, AL" dated December 28, 2001.  (Pla. ex. "A", Attachment "D").

The December, 2001, reinspection found that "most of the clearance violations in this system that were found to exist in August of 1999 have not been corrected…." (Pla. ex. "A", Attachment "D", at 3).  Bogie concluded that over fifty percent of the 192 items originally cited in the September, 1999, report had not, in fact, been corrected, including those not requiring any "make-ready" work by third parties. (Pla. ex. "A", Attachment "D", at 5-6).  Further, the December, 2001, reinspection identified an additional 102 violations not previously identified in the first inspection.

Charter hired Rogers Cable Television Consulting (a different contractor than that hired by Falcon in 1999) "to identify and correct safety violations."  (Pla. ex. "FF").  In correspondence dated January 22, 2002, Charter noted that "35% of our cable plant in Athens has been cleaned up … at a cost of $86,543."  (Pla. ex. "FF"). Of the 101 violations noted in the December 2001 reinspection report, Charter acknowledged that only sixteen required make-ready work from other utilities before they could be corrected.  (Pla. ex. "FF").  Charter represented that it had since corrected 58 of the noted violations, and that material was on order to correct another twenty-five violations.  (Pla. ex. "FF").

In an internal e-mail correspondence in November, 2001, Charter representative Mike Atkins noted that "[i]t will probably take 4-6 months to complete" the required corrections.  (Pla. ex. "GG").  In response, Charter representative Ron Johnson noted, "[f]our to six months is too long.  We need to put the rush on this.  We have had over two years and have not gotten the job done yet." (Pla. ex. "GG").

In February 2002, the City Council adopted two Resolutions.  The first Resolution (Pla. ex. "L") ordered and directed Charter to take certain actions pursuant to its obligations under the 1988 Franchise within thirty days, including to replenish the security deposit in the amount of $39,542.96, to correct each of the 192 violations

17

originally noted in the September, 1999, Report, and to correct "any other violations" existing within the City of Athens as of January 29, 2002.  The second Resolution (Pla. ex. "M") deemed Charter to be in default of its obligations under the Pole Attachment Agreement for a variety of reasons, most notably its failure to maintain its pole attachments in a safe and proper manner, as detailed in the September, 1999, and December, 2001, Reports.  The second Resolution further scheduled a public hearing to be held on March 21, 2002, for the purpose of determining Charter's ability to comply with its obligations under its Agreements with the City.  (Pla. ex. "M").

In the meantime, between January 18 and 20, 2002, the City performed an inspection of the Charter cable system in those areas of Limestone County outside the City limits where Charter's plant was attached to AED poles, again using Bogie to perform the inspection.  In his February 27, 2002, Report, Bogie detailed 93 plant violations based on his inspection of a sampling of locations within the County.  (Pla. ex. "A", Attachment "E", at 3, 6-7)  Because Bogie's inspection was "by no means a complete inspection", Bogie suggested that "the total number of violations in the system numbers many hundreds, if not over 1,000."  (Pla. ex. "A", Attachment "E", at 3).

Charter attended the Athens' City Council meeting of March 21, 2002, and submitted spreadsheets in a number of white binders reflecting the violations identified during the inspections by Bogie and during inspections performed by Kurt Rogers of Rogers Cable, together with certain corrective actions. Neither Charter nor its attorneys claimed that the noted violations were not caused by Charter or not otherwise attributable to Charter.

At the March 21, 2002, meeting, Charter's representative provided a summary of the violations and corrective action taken by Charter. (Pla. ex. "JJ".) Of the 293 violations noted in the September, 1999, and December, 2001, inspections, Charter represented that 213 had been repaired and the other 80 required make-ready work by AED, PCL, and Bell. (Pla. ex. "JJ"). Charter itself identified 897 "safety concerns" pursuant to its own inspection by Rogers, together with 2,300 instances of insufficient guy guarding. (Pla. ex. "JJ"). At the time of the March 21, 2002, meeting, Charter represented that 576 of these safety concerns had been repaired, with the remaining 321 requiring make-ready work by other utilities. Charter also indicated that it had placed all the required guy guards. (Pla. ex. "JJ").

On July 29, 2002, the City Council adopted a Resolution renewing the franchise for a forty-two month term. (Pla. ex. "J").

19

At the City's direction, a final inspection of the Charter cable system in both the City and the County was performed by Bogie between December 11 and 15, 2002. In his January 11, 2003, Report, Bogie concluded that "most of the clearance violations in this system that were found to exist in August of 1999 have still not been corrected" and noted an additional 78 violations not previously cited.  (Pla. ex. "A", Attachment "F", at 3, 10).   Additionally, as of this date, Charter had still not replenished the security deposit as requested by the City in June, 2001.

## F.    *The February 10, 2003 Meeting*

On January 17, 2003, the City transmitted a letter (Pla. ex. "LL") giving Charter notice of a City Council meeting on February 10, 2003.  Prior to the City Council meeting, members of the City of Athens City Council held a work session. No representatives from Charter were present at the work session.  Charter claims that its representatives were specifically excluded from the meeting (Terry Dep. at 82-83), but the City of Athens maintains that it was open to the public and that Charter was not excluded.

Charter representatives were present at the public meeting, which began after the working session at 5:30 p.m.   However, they did not speak or otherwise participate.  The City Council passed Resolution No. 2003-898 (Pla. ex. "I") which, *inter alia*, authorized the commencement of a declaratory judgment action to confirm

20

Charter's breach of its obligations under the Pole Attachment Agreement and 1998 Franchise.

Subsequent to the February 10, 2003, meeting, Charter's attorneys forwarded correspondence dated February 19, 2003, generally objecting to the provisions of Resolution No. 2003-898 and complaining that Charter was not allowed an opportunity to provide its "input" and "relevant information" to the City Council prior to the adoption of the Resolution. (Pla. ex. "U").

Special Projects Attorney Gardner responded to Charter's counsel by letter dated March 6, 2003, and specifically invited Charter to submit the additional information not presented at the February 10, 2003, meeting. (Pla. ex."R").

By letter dated April 15, 2003, Charter proposed an "overall settlement" in lieu of the declaratory judgment action referenced in the City's February 10, 2003, Resolution. (Pla. ex. "KK"). Among other things, Charter proposed paying the City $1.6 million in additional pole attachment fees over a ten year period. This offer was rejected by the City Council in favor of complete compliance by Charter of its obligations under the Pole Attachment Agreement and the 1988 Franchise. The City did, however, accept Charter's request to delay the filing of the declaratory judgment action until after the parties attended a meeting in July, 2003, at AED offices in Athens, Alabama.

## I.   The July 18, 2003, Meeting and Initiation of Suit

On July 18, 2003, Charter met with the City of Athens, including Mayor Williams and Rusty Monroe.  The parties orally agreed that the meeting would be confidential.  (Monroe Dep. at 324, 331-32; Terry Dep. at 98.)  In that meeting, the parties discussed the possible terms of settlement, including an annual fee of $5 to $15 per pole, which would result in additional revenue of $1.6 million to the City over the ten-year period.  No agreement was reached, however.  Following the July, 2003, meeting, the City directed its counsel to file the instant proceeding.

On October 7, 2003, Monroe was quoted by the Decatur Daily as telling a reporter that Charter had offered the City of Athens $1.6 million to excuse all safety violations.  (Def. ex. "MM"; Monroe Dep. at 325-27.)

## ANALYSIS

## I.   CHARTER'S COUNTERCLAIMS

The City of Athens moves for summary judgment as to all of Charter's counterclaims.  In addressing the City of Athens' grounds for summary judgment, the court first examines three of the City's defenses that apply broadly to several of Charter's counterclaims.  After resolving legal issues related to those broadly applicable defenses, the court will review the merits of each claim individually.

## A.    *Athens' Defense Under 47 U.S.C.A. § 555a(a)*

The City of Athens moves for summary judgment on all of Charter's counterclaims for monetary damages on the basis of § 555a(a) of title 47, United States Code.  *See* 47 U.S.C.A. § 555a(a).  Section 555a provides as follows:

> (a) Suits for damages prohibited
> In any court proceeding pending on or initiated after October 5, 1992, involving any claim against a franchising authority or other governmental entity, or any official, member, employee, or agent of such authority or entity, arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief.

47 U.S.C.A. § 555a(a).

City of Athens argues that § 555a(a) bars all of Charter's claims for money damages.  Charter responds that § 555a does not apply because Charter's claims do not "arise[] from the regulation of cable service," but instead arise from the regulation of the "cable system."  "Cable service" is defined as "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C.A. § 522(6).  By comparison, the term "cable system" is defined as "a facility, consisting of a set of closed

23

transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community."[2]  47 U.S.C.A. § 522(7).  Because § 555a(a) refers only to the regulation of "cable service" and not the "cable system," Charter argues that § 555a(a) is inapplicable.

Charter bases its argument on several presumptions.  First, Charter presumes that § 555a(a) does not apply on the basis that its claims arise "from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise."  Second, Charter presumes that the terms "cable system" and "cable service" not only are distinct, but that they are exclusive—that is, Charter presumes that the regulation of "cable service" would not also include the regulation of the "cable system."  Neither assumption is valid.

First, the "regulation of cable service" can logically be read to include the regulation of the "cable system."  "Cable service" is defined as "the one-way transmission to subscribers of … video programming," and it is difficult to see how a municipality would regulate that transmission without also regulating the "facility

---

[2]Section 522(7) contains several exceptions to the term "cable system," but neither party argues that those exceptions are relevant.

24

… and control equipment that is designed to provide cable service ….” 47 U.S.C.A. § 522(6), (7).

Second, to the extent ambiguity exists, nothing in the legislative history supports Charter's argument that the court should construe § 555a(a) narrowly so as to apply to the regulation of the “transmission to subscribers … of video programing” and not also to the regulation of “the facility … control equipment that is designed to provide” that transmission.  To the contrary, the legislative history supports reading § 555a(a) broadly to apply to a municipality's regulation of the cable system. *See* S. Rep. 102-92, at 48 (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1181 (citing, as the impetus to enact § 555a the fact that “[t]he authority of cities to regulate *cable television systems* is increasingly challenged in court on various statutory and constitutional grounds”).  Indeed, the history supports applying § 555a to all aspects of the municipality's regulation of the cable operator.  *See id.* at 49-50, *reprinted in* 1992 U.S.C.C.A.N. at 1182-83 (“Section 628 applies to any action expressly authorized or required by title VI of the 1934 Act, including a franchising authority's decision to grant or deny a franchise, renew or not renew a franchise, approve or deny the transfer of a franchise, amend or not amend a franchise, or *otherwise regulate a cable operator under title VI*.”).

This construction of § 555a(a) is supported by Congress' stated purpose in enacting § 555a(a), which was "to limit the franchising authorities' liability for monetary damages" against lawsuits, like the instant suit, brought by cable companies, like Charter, "who have not been issued franchises on the terms and conditions they wished," who "seek damages from franchising authorities, typically under the Civil Rights Act of 1871 (42 U.S.C. 1983), and parallel State civil rights laws, as well as injunctive relief." *Id.* at 48-50, *reprinted in* 1992 U.S.C.C.A.N. at 1181-83; *see also Jones Intercable v. City of Chula Vista*, 80 F.3d 320, 326 (9th Cir. 1996) (describing the purpose of § 555a(a) as protecting municipalities from "potentially crippling civil damages liability claims in relation to their regulation of cable operators."). Moreover, the only limits on the application of § 555a(a) noted by Congress have nothing to do with the regulation of the cable system. *See id.* (noting that the law "does not intend to protect local franchising authorities from damages where an individual proves discrimination on the basis of race, color, sex, age, religion, national origin or handicap" and does not apply where a franchising authority "knowingly violates a ruling of a court of binding jurisdiction that an action or failure to act by the franchising authority violates a cable operator's First Amendment rights").

Charter's narrow interpretation of § 555a(a) also is not supported by case law. In *Jones Intercable v. City of Chula Vista*, the most analogous case cited by the parties, the Ninth Circuit observed that "it is difficult to see what the City was doing, if not regulating, when it precluded [the plaintiff] from installing more cable infrastructure and from servicing customers unless [the plaintiff] first obtained a city-wide franchise." 80 F.3d at 324.  This comment clearly evidences the Ninth Circuit's view that the regulation of "installing more cable infrastructure" is regulating "cable service" as per § 555a(a).

Based upon these considerations, the court finds that all of Charter's counterclaims, with the exception of the claim of breach of the confidentiality agreement (Counterclaim V), arise from the City of Athens' regulation of cable service.  The court also finds that the same counterclaims equally arise from "decision[s] of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise." 47 U.S.C.A. § 555a(a).  Section 555a(a) exempts the City of Athens from monetary damages on these counterclaims.  Accordingly, the City of Athens' motion for summary judgment on Charter's claims for money damages pursuant to its First, Second, Third, Fourth, Sixth, Seventh, and Eighth Counterclaims

is due to be GRANTED, and Charter's motion for summary judgment on these counterclaims is due to be DENIED.[3]

**B.**     ***Athens' Statute of Limitations Defenses***

The City of Athens moves for summary judgment with respect to Counterclaims I, II, III, IV, VI, VII, and VIII on the grounds that the claims are barred by applicable statutes of limitations.  Because Counterclaims I, II, and IV are federal claims while Counterclaims III, VI, VII, and VIII are state law claims, each set of claims is governed by a separate statute of limitations.

1.     *Charter's Federal Claims*

With regard to Counterclaims I, II, and IV, the parties agree that the applicable statute of limitations is the two year statute of limitations set by Alabama Code § 6-2-38(l).  *See* ALA. CODE OF 1975 § 6-2-38(l); *see also Jones v. Preuit & Mauldin (Jones II),* 876 F.2d 1480, 1483 (11th Cir. 1989).  Because the instant action was filed on September 8, 2003, Charter can recover only on those counterclaims arising prior to September 8, 2001.

---

[3]Section 555a(a) applies to franchising authorities and their "agents."  Because Monroe and Monroe Telecom indisputably were the limited agents of the City of Athens, any claims in the cited sections of Charter's Counterclaims for money damages against Monroe and Monroe Telecom also are barred.

Charter argues that all of its counterclaims accrued after September 8, 2001. The City of Athens argues that several of Charter's counterclaims accrued well before September, 2001. This question is governed by federal law. *See Lovett v. Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003) (stating that on a § 1983 claim "[f]ederal law determines when the statute of limitations begins to run."). Under federal law, "'the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Id.* (quoting *Rozar v. Mullis*, 85 F.3d 556, 561-62 (11th Cir. 1996)).

Charter admits that several transactions on which it brings counterclaims occurred prior to September 8, 2001.[4]  As to these transactions, however, Charter argues that they are timely under either a continuing violation theory or because the facts which would support a cause of action were not apparent at the time the acts were committed.

With respect to the continuing violation theory, this theory is an import from Title VII jurisprudence, and the Supreme Court recently had occasion to clarify the application of the theory. In *National Railroad Passenger Corp. v. Morgan*, the

---

[4]These transactions include (1) the issuance of the first Bogie Report along with the expenditures Charter made in response to the report; and (2) the City's act of withdrawing $39,542.96 from Charter's security fund.

Supreme Court instructed that, with respect to continuing violation theories, courts are to distinguish between claims of harassment, which by their nature constitute an on-going practice, and claims of discrete acts of discrimination.  *See* 536 U.S. 101, 115 (2002).   With respect to discrete conduct, the "discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Id.* at 110.  As a result, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.*  at 113.  However, a plaintiff is not barred from "using the prior acts as background evidence in support of a timely claim."  *Id.*

Applying these principles here, it is clear that Charter does not assert a claim based on harassing conduct.   Rather, Charter complains of discrete, allegedly discriminatory acts.  Accordingly, each claim accrued on the day that each allegedly unlawful discrete act was committed, unless the claim is subject to tolling.

Charter argues that its counterclaims are subject to tolling because the facts which would support its causes of action were not apparent on the day they occurred. The first such fact, Charter argues, is that the Bogie Reports allegedly do not list violations that Charter *necessarily* caused, but only violations that Charter *may* have caused.

However, Charter's alleged unawareness of this alleged fact is not sufficient to delay the accrual of Charter's claims based upon the first Bogie Report.

30

Essentially, Charter complains that it was not aware that the Bogie Report was fallible.  The court finds that "a person with a reasonably prudent regard for his rights," *see Lovett*, 327 F.3d at 1182, would not have presumed infallibility, as Charter claims to have done here.  Furthermore, the court notes that Charter hired its own expert, Mark Hooper, in 2000, and that Hooper indeed performed the due diligence on the Bogie Report that Charter claims it could not reasonably have accomplished.  Accordingly, Charter is not entitled to toll the statute of limitations.

Charter's claims under § 1983 and § 1985 based upon conduct occurring prior to September 8, 2001, are time-barred.  Charter may not recover for the expenditures it made pursuant to the first Bogie Report, nor can it recover based upon the City's withdrawal of the $39,542.96 from Charter's security fund.

2.    *Charter's State Law Claims*

Section 11-47-23 provides:

> All claims against the municipality (except bonds and interest coupons and claims for damages) shall be presented to the clerk for payment within two years from the accrual of said claim or shall be barred. Claims for damages growing out of torts shall be presented within six months from the accrual thereof or shall be barred.

Ala.Code of 1975 § 11-47-23.  It is undisputed in this case that Charter failed to present its claims to the City of Athens' clerk as required by this provision.  (Bower

31

Aff. ¶ 24.)  Accordingly, Charter's tort claims against the City of Athens that accrued prior to March 8, 2003, are barred.  Furthermore, all claims other than torts are barred to the extent that they accrued prior to September 8, 2001.  To the extent that Charter brings Counterclaims VI, VII, and VIII upon conduct occurring prior to March 9, 2003, and to the extent that Charter brings Counterclaim III based upon conduct occurring prior to September 8, 2001, the City of Athens' motion for summary judgment is due to be GRANTED, and Charter's motion for summary judgment DENIED.

### C.    *Athens' Municipal Immunity Defense*

Charter concedes that it is barred from recovering on intentional torts from the City of Athens.  *See Scott v. City of Mountain Brook*, 602 So.2d 893, 894-895 (Ala. 1992).  Because the Alabama state law claims of conspiracy (Count V), intentional misrepresentation (Count VI),[5] promissory fraud (Count VII), and intentional interference with existing and prospective business relations (Count VIII) are intentional torts, the City of Athens' is entitled to summary judgment as to these claims on its municipal immunity  defense.

---

[5]In Counterclaim VI, Charter also asserts innocent, negligent, or reckless misrepresentation by the City.  These claims are not barred by municipal immunity.

### C.    *Reviewing Charter's Counterclaims Individually*

#### 1.    *Counterclaim I: §1983*

Counterclaim I asserts an action under § 1983.  "In order to prevail on a § 1983 claim, the Plaintiffs must show that: (1) the conduct complained of was committed by a person acting under the color of state law; and (2) the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."  *Duke v. Smith*, 13 F.3d 388, 392 (11th Cir. 1994).  Although the parties disagree over whether Monroe acted under color of state law, there is no dispute that the City of Athens is a covered entity.  *Wyke v. Polk County School Bd.*, 129 F.3d 560, 568 (11th Cir. 1997) ("[M]unicipalities and other local government entities are included among those persons to whom § 1983 applies.").

Charter alleges violations of its rights to equal protection of law, due process, and under the Constitution's Contracts Clause.  The court already has determined that, under 47 U.S.C.A. § 555a(a), Charter is not entitled to money damages on these claims.  Furthermore, the court has determined that Charter cannot recover for any alleged constitutional violation occurring prior to September 8, 2001.  This leaves

only Charter's claims for declaratory and injunctive relief remaining under this count.[6]

i.       Charter's Equal Protection Claim

Charter bases its claim that the City violated its rights under the equal protection clause on the theory that the City of Athens singled it out for especially rigid application of the NEC and the NESC.  "In order to prevail on an equal protection claim based upon the application of a facially neutral statute, it must be established that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff." *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996).

Charter first must present some evidence from which a jury could find that the City of Athens enforced the NEC and NESC more strictly against Charter than it did a similarly situated person.  Charter offers PCL, the other cable company operating in the City of Athens, as a similarly situated person.  However, the mere fact that PCL is another cable company operating in the City of Athens is not necessarily sufficient to create a genuine dispute of fact as to whether PCL is a similarly-situated party.

---

[6]Charter's sole basis for seeking restitution was based upon the City's withdrawal of $39,542.96 from Charter's security fund.  The court has determined that this claim is time-barred.

It is well-established that "[d]ifferent treatment of dissimilarly situated persons does not violate the Equal Protection Clause." *Strickland*, 74 F.3d at 265. The Eleventh Circuit has held that where a plaintiff fails to present evidence that others violated an ordinance as egregiously as the plaintiff did, the plaintiff fails to show a prima facie case of disparate enforcement. *Id.*

The City of Athens has offered the affidavit of Mike White, one of the owners and managers of PCL. White states that, in 1999, PCL received reports from Russell Bogie citing violations by PCL and that PCL fixed the problems cited in those reports. (White Dep. ¶ 9-11.) Charter's only response to this evidence is that Bogie conducted four inspections of Charter's violations, while only conducting a single inspection of PCL's violations. The City of Athens responds by arguing that Bogie was directed to conduct additional inspections of Charter because Charter failed to remedy all of its violations. (Williams Dep. at 14-16.) Furthermore, the City of Athens has presented evidence that PCL "made all of the corrections requested by the City." (White Aff. ¶ 11.) Charter failed to present any evidence rebutting this testimony. Accordingly, Charter's response falls short of creating a genuine dispute as to whether Charter and PCL violated and remained in violation of the NEC and the NESC to a sufficiently similar degree to qualify as similarly-situated parties.

35

Charter also has presented no evidence that the City unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff.   The standard for meeting this element is a high one.  "Mere error or mistake in judgment when applying a facially neutral statute does not violate the equal protection clause. There must be intentional discrimination." *E & T Realty v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987).  "Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker selected a particular course of action at least in part because of its adverse effects upon an identifiable group." *Id.*

Charter's sole theory for the City's alleged disparate enforcement of the NEC and NESC is the City's desire to extract non-tax revenue from Charter.  However, Charter gives no explanation for why that motivation would not apply equally to PCL.  In any event, the Eleventh Circuit's standard for disparate enforcement is clear. Charter must show that the City was motivated due to Charter's membership in an identifiable group.  Charter has presented no such evidence.  Accordingly, the City's motion for summary judgment as to Charter's disparate enforcement claim is due to be GRANTED, and Charter's motion for summary judgment on the claim DENIED.

ii.    Charter's Due Process Claim

Counterclaim I also seeks to recover on the ground that the City of Athens violated Charter's right to due process.  On February 10, 2003, the City of Athens passed Resolution 2003-898, which required Charter to vacate its equipment from various guy anchors owned by the Athens Electric Department within 30 days.  At its own expense, Charter complied, vacated all the guy wires, and moved its equipment to its own guy wires.  In bringing the instant due process claim, Charter argues that the expenditure constituted a deprivation of property.

"[A] § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process."  *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).

The first question is whether Charter has shown a deprivation of a protected property interest.  To do so, Charter must show a deprivation of a property interest that was "created and defined by independent sources of law, such as state law" which "invests the plaintiff with a legitimate claim of entitlement protected by the due process clause."  *Ward v. Downtown Development Authority*, 786 F.2d 1526, 1531 (11th Cir. 1986) (internal quotations omitted).

37

First, it should be noted that Charter does not argue that it has a property interest in the City's guy anchors. Rather, Charter's only argument is that it had a property interest in its franchise with the City, and that "the City cannot take actions affecting or relating to Charter's franchise without providing Charter 'due process of law.'" (Def.'s Mem. Supp. Summ. J. at 45.) In response, the City quarrels with Charter's loose use of the words "actions affecting or relating to Charter's franchise." The City notes that Charter's franchise never was terminated, suspended, or otherwise jeopardized. Instead, the City argues, it merely passed a resolution that Charter should vacate the City's guy anchors within thirty days and Charter complied.

The court agrees with the City that Charter's claim of deprivation of its property interest in the franchise is, at best, premature. Actions that "affect" or "relate" to Charter's franchise are not tantamount to actions "depriving" Charter of its franchise. If Charter had not complied with the City's resolution and if, in response, the City terminated Charter's franchise, then Charter could allege a deprivation of property. As it stands, however, Charter was in no way deprived of its cable franchise with the City.

Because Charter has failed to show a deprivation of a property interest, the court does not need to inquire whether due process would have required the City to notify Charter not only of the City Council meeting during which the City passed the

38

relevant resolution, but also of the preliminary work session held by City officials prior to the City Council meeting.  The City of Athens' motion for summary judgment on Charter's due process claim is due to be GRANTED, and Charter's motion for summary judgment DENIED.

iii.   Charter's Contract Clause Claim

Charter also claims that the City of Athens violated its rights under the Constitution's Contract Clause.  That clause, found in article I, clause 1, provides that "no state shall ... pass any Law impairing the Obligation of Contracts ...."   U.S. CONST. Art. I, § cl. 1.  "In evaluating a Contracts Clause claim, the court must determine whether the state law operates as a substantial impairment of a contractual relationship and if so, whether the impairment is necessary to meet an important government interest." *Flanigan's Enters., Inc. v. Fulton County*, 242 F.3d 976, 989 (11th Cir. 2001).

Charter's first requirement is to show a substantial impairment of a contractual relationship caused by state law.  It has not done so.  Instead, Charter bases its claim entirely on instances where it alleges that the City of Athens breached either the franchise agreement or breached the alleged "covenants that courts imply into every contract under Alabama law." (Def.'s Mem. Opp. Summ. J. at 26.) However, Charter has failed to cite any authority for the proposition that the Contracts Clause is

39

violated by a municipality's mere breach of contract or breach of a contract's covenant of good faith and fair dealing, nor can the court discern any wisdom in such a principle.[7]  In any event, the law under the Contracts Clause is to the contrary.  *See Jackson Sawmill Co. v. United States*, 580 F.2d 302, 312 (8th Cir. 1978) ("The Constitution does not provide a federal action for simple breach of contract.").

Charter has failed to present any evidence of a substantial impairment of any contract relationship caused by state law.  Accordingly, the City of Athens' motion for summary judgment as to Charter's Contract Clause claim is due to be GRANTED, and Charter's motion for summary judgment DENIED.  In addition, because the court has failed to find a genuine dispute of fact with respect to any of Charter's claims under § 1983, the City of Athens' motion for summary judgment as to Counterclaim I is due to be GRANTED.[8]

### 2.      *Counterclaim II: Invalidity of the Wireline Act*

On Charter's claims challenging the validity of the Wireline Act, the City of Athens' sole argument is that Charter lacks standing.  The City of Athens attacks

---

[7]Furthermore, the only breach of the franchise agreement asserted by Charter relates the City's withdrawal of $39,542.96 from Charter's security fund.  The court has determined that this claim is time-barred.

[8]For identical reasons, the Monroe defendants also are entitled to summary judgment. The court therefore need not address the question of whether the Monroe defendants constituted state actors.

Charter's standing to bring this challenge on the ground that Charter has not suffered any injury-in-fact because the City has not applied the Wireline Act to Charter or to anyone else.

The City's standing challenge begins with an analysis of whether a case or controversy exists between the parties over the Wireline Act.   In order to prove that a real and substantial controversy exists, "a plaintiff must show 'a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement.'" *ACLU v. The Florida Bar*, 999 F.2d 1486, 1492 (11th Cir. 1993) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Charter argues that it has standing to challenge the Wireline Act despite the lack of enforcement.  In support of this argument, Charter relies on a line of cases which permit pre-enforcement challenges to laws where a plaintiff can show that: "(1) plaintiff was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution."   *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 221 F.3d 1211, 1214 (11th Cir. 2000) (quoting *Jacobs v. Florida Bar*, 50 F.3d 901, 904 (11th Cir. 1995) (alteration in quotation omitted).

While Charter is correct that pre-enforcement standing is available in certain instances, Charter has failed to show that it is entitled to bring a pre-enforcement

41

challenge here.  Parties seeking to take advantage of standing to challenge a statute prior to enforcement always have been required first to show that a constitutional interest is at stake.  *See Steffel v. Thompson*, 415 U.S. 452 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his *constitutional rights*."); *ACLU*, 999 F.2d at 1492 ("When a plaintiff has stated that he intends to engage in a specific course of conduct arguably affected with a *constitutional interest*, however, he does not have to expose himself to enforcement to be able to challenge the law."); *Am. Charities for Reasonable Fundraising Regulation*, 221 F.3d at 1214 ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a *constitutional interest*, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'").  The presence of a threatened constitutional interest is crucial because the relaxation of the standing requirements are motivated, in large part, by the concern that "criminal defendants [are prevented] from challenging the constitutionality of a law in federal court once a criminal proceeding under that law is pending in state court."  *ACLU*, 999 F.2d at 1493.  The pre-enforcement exception therefore accords a potential

defendant "the opportunity to challenge in federal court the constitutionality of the law as soon as state sanctions have been threatened." *Id.*

Here, however, by challenging the Wireline Act, Charter does not seek to vindicate constitutional interests. Charter does not contend that it "intends to engage in a specific course of conduct arguably affected with a constitutional interest." Rather, Charter's sole claim under Counterclaim II is that the Wireline Act derogates from provisions of the Cable Act and other federal laws. Because Charter has not shown that any constitutional interest is imminently threatened, Charter does not have standing to challenge the Wireline Act unless and until the application of the Act causes injury.

Moreover, it is well-established that the court may postpone adjudication "until a better factual record might be available" so that the court "might acquire information regarding how the challenged procedures actually operate, in lieu of the predictive evidence that appellees introduced at trial." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 300 (1979). A court is permitted to exercise this discretion especially in the case of declaratory judgments, which, "like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest [and not] in speculative situations." *Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962).

43

Applying that principle here, it is obvious to the court that it should not, at this time, entertain a pre-enforcement challenge to the Wireline Act, even *arguendo* if the Charter possessed standing to prosecute its challenge.  Because the City of Athens has never before enforced the Wireline Act, the court would be forced to engage in utter speculation in determining whether the Act would operate in violation of the Cable Act.

Accordingly, the City's motion for summary judgment as to Counterclaim II is due to be GRANTED, and Charter's motion is due to be DENIED.

### 3.   *Counterclaim III:  Breach of Franchise*

Charter argues two theories for how the City of Athens violated the franchise. First, Charter argues that the City directly breached the franchise when it withdrew $39,542.96 from Charter's security fund.  Charter also claims that the City breached implied-at-law covenants.

Addressing the alleged breach of the franchise first, Charter argues that the City violated the franchise on June 21, 2001, by withdrawing $39,542.96 from Charter's security fund.  However, as explained above, under § 11-47-23 of the Alabama Code, Charter is barred from bringing a claim that accrued prior to September 8, 2001.  *See* ALA.CODE OF 1975 § 11-47-23.

With respect to Charter's claims of breach of the implied covenants, Charter argues that the City violated the covenant of good faith and fair dealing and the covenant not to hinder or delay Charter's performance of the contract.   Charter contends that the City violated these covenants by (1) representing in the Bogie Reports that Charter was responsible for numerous NEC and NESC violations, (2) waiving compliance with the NEC and NESC only to require enforcement in the late 1990s, and (3) failing of complete make-ready requests in a timely manner.   Charter argues that this conduct made "Charter's performance more burdensome and deprived Charter of the benefits of its contracts with the City."  (Def.'s Mem. Opp. Summ. J. at 27.)

Charter's argument founders, however, when its claim is applied to the law. The Alabama Supreme Court has made clear that "there is no good faith contractual cause of action; that means that bad faith is not actionable absent an identifiable breach in the performance of specific terms of the contract." *Lake Martin/Alabama Power Licensee Ass'n v. Alabama Power Co.,* 601 So. 2d 942, 945 (Ala. 1992) (citation omitted).  Charter has failed to identify any non-time-barred breach by the City in the performance of a specific term of the contract, express or implied.  The conclusion therefore follows that "there is no contractual cause of action for breach

of an implied duty of good faith that nebulously hovers over the contracting parties, free from the specific terms of the contract." *Id.*

Regarding the covenant not to hinder or delay contractual performance, Alabama law only recognizes "a breach of an implied promise not to hinder or delay performance of the specific terms of the contract by the other party, which contracting parties impliedly promise not to do." *Id.* Charter argues that, by failing to complete in a timely manner the make-ready work requested by Charter, the City hindered Charter's performance of maintaining its plant in compliance with the NEC and the NESC as required by the franchise. Although the City has indicated that it does not intend to hold Charter responsible for the City's failure to complete make-ready work requested by Charter (Scroggins Aff. ¶ 19), it is not clear that this is so.

The City seeks to hold Charter responsible for all the violations listed in the Bogie Reports. (*See* Amended Compl. ¶ 45.) The Bogie Reports, however, do not clearly delineate which of the cited violations were the subject of make-ready requests to the City. Factual questions remain as to what extent, if any, the City's failure to complete make-ready work in a timely manner was responsible for any of Bogie's findings that Charter's plant was in violation. These factual questions prevent the award of summary judgment to either party on this claim.

Accordingly, the City's motion for summary judgment as to Counterclaim III is due to be GRANTED IN PART as to Charter's claim of breach of an express term and its claim of breach of the covenant of good faith and fair dealing, and DENIED IN PART as to Charter's claim of breach of the covenant not to hinder or delay contractual performance.   Charter's motion for summary judgment on the Counterclaim is due to be DENIED.

4.    *Counterclaim IV: Conspiracy*

In Counterclaim IV, Charter asserts claims of civil conspiracy under 42 U.S.C.A. § 1985 and under Alabama state law.

To prevail on its § 1985(3) claim, Charter must show "(1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Childree v. UAP/GA AG CHEM, Inc.*, 92 F.3d 1140, 1146-47 (11th Cir. 1996).   In addition, "a claim under § 1985(3) requires the proof of invidious discriminatory intent as well as the violation of a serious constitutional right protected not just from official, but also from private encroachment."   *Trawinski v. United Tech.*, 313 F.3d 1295, 1299 (11th Cir. 2002).

Based upon this court's conclusions, discussed above, that Charter has failed to produce any evidence that the City violated Charter's constitutional rights, Charter's claim of conspiracy under § 1985 fails. Furthermore, based upon the City's entitlement to municipal immunity against intentional tort suits, Charter's claim of civil conspiracy also lacks merit. Accordingly, the City's motion for summary judgment as to Counterclaim IV is due to be GRANTED, and Charter's motion for summary judgment on the Counterclaim is due to be DENIED.

5.   *Counterclaim V: Breach of Confidentiality Agreement*

In Counterclaim V, Charter seeks to recover from Rusty Monroe and Monroe Telecom for Rusty Monroe's disclosure to a reporter that Charter offered to settle the case for $1.6 million paid over ten years. The $1.6 million figure had been discussed during a settlement conference in July, 2003, and the details of that settlement conference were subject to a confidentiality agreement.

The City's defense to this counterclaim essentially asserts that the offer of $1.6 million was not covered by the confidentiality agreement that the parties entered into in July because the offer already had been discussed in April, 2003. Monroe argues that he learned of the $1.6 million offer from a letter sent to him by Charter on April 15, 2003. (Pla. ex. "KK".)

The validity of this defense cannot be determined on summary judgment. The parties agree that the confidentiality agreement entered into by the parties was oral, and, as a result, the terms of the agreement, including the term defining what would and would not be subject to non-disclosure, are subject to conflicting testimony from the parties. (Monroe Dep. at 324, 331-32; Terry Dep. at 98.) Charter argues that the non-disclosure agreement covered everything discussed during the settlement conference, while the City argues that it did not cover any matters or proposals discussed by the parties on an earlier occasion. Moreover, it is well-settled that "[w]here a contract is verbal and detailed by witnesses, its terms and the intention of the parties should be found by the jury." *MOCO, Inc. v. Gaines*, 484 So.2d 470, 472 (Ala. Civ. App. 1985) (citing *Keel v. Weinman*, 98 So.2d 611 (Ala. 1957)).

Accordingly, the motions for summary judgment filed by Charter and the City are due to be DENIED.

### 6.   *Counterclaim VI: Misrepresentation*

In its Sixth Counterclaim, Charter seeks recovery against the City of Athens, Rusty Monroe, and Monroe Telecom for innocently, negligently, recklessly, or intentionally issuing false reports created by Russell Bogie, thereby causing Charter injury. Charter argues that Bogie's reports contained misrepresentations because the reports falsely indicated that Charter caused all of the discrepancies cited therein. As

discussed above, under the doctrine of municipal liability, Charter is barred from bringing its claim of intentional misrepresentation.  Furthermore, the court concludes that, under 47 U.S.C.A. § 555a(a), Charter is barred from bringing money damages claims for negligent or innocent misrepresentation against the City.  As discussed above, § 555a(a) limits Charter's damages against the City and its agent, Monroe, to injunctive and declaratory relief.  Because Charter does not seek declaratory relief in relation to its misrepresentation claim, Charter's sole remaining claim must be for injunctive relief.  While the court has substantial doubts as to whether injunctive relief is available on a claim of reckless, negligent, or innocent misrepresentation, the court will address the claim on its merits.

A claim of misrepresentation requires "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation.  *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So.2d 1143, 1160 (Ala. 2003) (quoting *Padgett v. Hughes*, 535 So.2d 140, 142 (Ala.1988)).

The first two elements require Charter to present evidence of a false representation concerning an existing material fact.  Charter attempts to fulfill these requirements by arguing that the Bogie Reports contained misrepresentations insofar as those reports stated that Charter "caused" the violations of the NEC and NESC

cited in the reports.  This argument fails, however, because Bogie's lists of NEC and NESC violations do not constitute representations concerning existing material facts. Rather, Bogie's lists of violations constitute Bogie's opinions and judgments as to whether Charter's plant complies or fails to comply with NEC or the NESC.

Significantly, Charter does not present evidence, nor does it attempt to argue, that Bogie made misrepresentations as to existing facts related to Charter's plant. Charter does not maintain, for instance, that Bogie stated that a required guy anchor was missing when, in fact, the anchor was present.  Nor does Charter argue that Bogie represented in his report that in his judgment a violation existed when, in fact, Bogie believed that no violation existed.  Instead, Charter's sole claim is that the Bogie Reports contain representations that Charter caused the violations when, in fact and as Bogie testified (Bogie. Dep. at 85-86, 176, 258), Charter may not be the responsible party.

The mere fact that Bogie's opinion and judgment may be in error cannot give rise to a claim of false representation.  Although an opinion can give rise to a claim of fraudulent inducement or promissory fraud, those claims require a showing that the opinion was made with the intent to deceive. *See Birmingham Broadcasting Co. v. Bell*, 259 Ala. 656, 664 (1953) ("As to promises (or opinions) there must have been at the time an intention not to do the act promised (an existing status) and that it was

made with the intent to deceive.").  Charter has failed to present any evidence that

Bogie made his reports with the intent to deceive Charter, and even if he had, Charter

would be barred from recovery under the doctrine of municipal immunity.

Furthermore, the Bogie Reports expressly qualify their findings by mentioning

the possibility that certain violations could be caused by third parties.  For instance,

the first Bogie Report states:

> Often cable operators will argue that violations of these
> type [clearance violations] are not under their control, that
> is that they were caused by the power utility.…   It is
> recognized that correction of some of the violations
> involving insufficient clearances may require action on the
> part of power and telephone utilities, [sic] it is the
> responsibility of the cable operator to initiate the requests
> necessary for these other utilities to act.

Pla. ex. A, Attachment "C", Bogie Report, dated September 15, 1999, at 5.

Given this qualification, even interpreting the facts in the light most favorable

to Charter, the court cannot determine that there is a genuine question of fact as to

whether the Bogie Reports contain representations that Charter *caused* all of the

violations the reports cites.  The report expressly states that this may not be the case.

In light of the foregoing, the City of Athens' motion for summary judgment as

to Counterclaim VI is due to be GRANTED, and Charter's motion for summary

judgment on the Counterclaim DENIED.

### 7. *Counterclaim VII: Promissory Fraud*

Promissory Fraud is an intentional tort. *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So.2d 1143, 1160 (Ala. 2003) (a promissory fraud claim requires, *inter alia*, "proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised" and "proof that the defendant had an intent to deceive."). Therefore, as discussed above, under the doctrine of municipal immunity, the City is entitled to summary judgment as to Charter's Seventh Counterclaim.

### 8. *Counterclaim VIII: Intentional Interference with Existing and Prospective Business Relations*

Intentional interference with existing and prospective business relations is an intentional tort. Therefore, as discussed above, under the doctrine of municipal immunity, the City is entitled to summary judgment as to Charter's Eighth Counterclaim.

## II. THE CITY'S DECLARATORY JUDGMENT CLAIMS

Charter also seeks summary judgment on the City of Athens' four counts for a declaration. Each count will be addressed in turn.

### A.   *Count I*

In Count I, the City seeks a declaration that the Cable Ordinance and Pole Attachment Agreement are valid and lawful in all respects and that, under the Ordinance and the Agreement, Charter is obligated to comply with all relevant safety standards including the NESC and the NEC.  Charter moves for summary judgment on the count on the ground that the requested declaration is overbroad. Charter argues that a declaration that the Cable Ordinance and the Pole Attachment Agreement are lawful in all respects goes far beyond any controversy that exists in this case and therefore primarily would constitute an advisory opinion.   The City of Athens responds by arguing that Charter has contested the validity of both agreements, and that, therefore, a declaration addressing the validity of the agreements as a whole is ripe.

Under § 2201, title 28, United States Code, a party may seek a declaration only in the case of "an actual controversy."  28 U.S.C.A. § 2201(a).  The City has adduced evidence demonstrating the existence to some degree of a controversy with respect to the validity of the Cable Ordinance and the Pole Attachment Agreements.  Indeed, as noted by the City, in Charter's second Counterclaim, Charter sought a declaration that the Cable Ordinance was "preempted" by the Cable Act and that the Ordinance therefore was void "to the extent [it] is preempted."  (Def. Counterclaim & Third-

Party Compl., doc. 40, ¶ 76, 115(B)(iv).)   With respect to the Pole Attachment Agreement, Charter has sought to enjoin its enforcement to the extent that its enforcement produces fines in excess of the amount of the franchise fees authorized by the Cable Act.   Thus, it is clear that controversies over the validity of the Cable Ordinance and the Pole Attachment Agreement exist; it merely is unclear to what extent the City has called their validity into question.

Even so, this conclusion— that genuine factual issues exist as to the extent to which there is controversy over the validity of these agreements—is sufficient to require the court to DENY Charter's motion for summary judgment on this count. Moreover, Charter has failed to cite any authority supporting its position that the City is precluded from obtaining partial relief on its count for a declaration.   Thus, even if Charter had not challenged the validity of the Cable Ordinance and the Pole Attachment Agreement in their entirety, Charter would have failed to demonstrate its entitlement to summary judgment on Count I.

## B.   *Count II*

In Count II, the City of Athens seeks a declaration that Charter failed to comply with the Pole Attachment Agreement, the Cable Ordinance, and with the provisions of the NESC and the NEC by allowing or creating violations thereof as indicated in the four reports of Russell Bogie.

55

Charter first moves for summary judgment on the ground that the City either waived or is estopped from strictly enforcing the NEC and the NESC.  Charter bases its estoppel and waiver arguments on two alleged facts: (1) that the Athens Electric Department ("AED") tolerated technical discrepancies in its plant for years prior to applying these safety codes to Charter; and (2) that the AED told Charter to "use the same holes" when updating its plant in 1996-97, causing Charter to expend considerable sums in reliance on that representation.  (Montgomery Aff. ¶ 5; White Aff. ¶ 7.)

There are three problems, however, with granting Charter's motion for summary judgment on this count on waiver or estoppel grounds.  The first problem is that the Pole Attachment Agreement has an express "no waiver" clause. The clause provides:

> Failure to enforce or insist upon compliance with any of the terms o[r] conditions of this agreement shall not constitute a [g]eneral waiver or relinquishment of any such terms or conditions, but the same shall be and remain at all [] times in full force and effect.

Pole Attachment Agreement, dated June 15, 1965, ¶ 13.

Second, the rules of equitable estoppel do not permit its application here. It is well-settled that "[e]quitable estoppel is to be applied against a governmental entity

only with extreme caution or under exceptional circumstances." *City of Orange Beach v. Benjamin*, 821 So.2d 193, 196 (Ala. 2001).  Furthermore,

> [u]nder the settled law, equitable estoppel … must be predicated upon the conduct, language, or the silence of the party against whom it is sought to be invoked.  Said conduct, language, or silence must amount to the misrepresentation or concealment of a material fact or facts.  The representation must be as to the facts and not as to the law.  The doctrine of equitable estoppel is not a bar to the correction … of a mistake of law.

*Id.*  Lax enforcement is not in the nature of a misstatement of fact.  Instead, it is in the nature of a misstatement of law.  Accordingly, Charter cannot base an estoppel argument on the City's alleged lack of enforcement of the electrical safety codes.

Third, genuine questions of fact prevent the court from awarding summary judgment to Charter at this time.  Specifically, with reference to Charter's claim that City officials instructed Charter to "use the same holes," many of these same witnesses testified that they qualified those statements by saying that Charter could use those holes "provided that they comply with the NEC and NESC."  (Lannon Aff. at 7; Scroggins Aff. at 13.)  Waiver is the voluntary, intentional relinquishment of a known right.  *See Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1348 (11th Cir. 1994).  The testimony of Lannon and Scroggins rebuts Charter's claim that their statement to "use the same holes" constituted an intentional relinquishment of the

City's right to require adherence to the NEC and NESC.  Consequently, at the very least, a genuine issue of fact exists on this issue of whether the instruction to "use the same holes" constituted a waiver.

Charter also argues that the City has failed to present any evidence that Charter violated any provisions of the NEC or the NESC.  In support of this argument, Charter asks the court to disregard the Bogie Reports and the affidavits of Russell Bogie due to Bogie's admission that his reports do not establish that Charter necessarily caused every violation that he cited.  Charter contends that causation can be shown only by conducting a pole history; because the City never conducted a pole history, it now lacks any evidence that Charter caused any violations.

Bogie testified by affidavit that 306 of the 565 violations contained in his report can be attributed to Charter with a high level of certainty.  (Bogie Aff. at 21-36)  While Bogie did admit that for the so-called "clearance" violations, a pole history would be required to definitively show which party was responsible for the violations, Bogie attested that only the remaining 259 violations might be attributable to a third-party.  (*Id.*)  In addition, Charter has offered no evidence that any citation in Bogie's reports actually are incorrect or improperly attribute a problem to Charter that actually should be attributed to a third-party.  Rather, Charter only conjectures that Bogie's citations might be wrong or that a third-party might be responsible.  Given

Charter's complete absence of evidence and given the court's obligation to accept Bogie's testimony as true and to draw all reasonable inferences in the City's favor, Charter has failed to show that it is entitled to summary judgment on the question of whether it violated the NEC or the NESC.    Accordingly, Charter's motion for summary judgment as to Count II of the Complaint is due to be DENIED.

   **D.**   *Counts III and IV*

   In Counts III and IV, the City of Athens seeks a declaration that the City has a right to terminate the Pole Attachment Agreement and the Cable Ordinance.

   Both the Pole Attachment Agreement and the Cable Ordinance provide for termination if Charter violates the terms of the agreements.  Section 20(C) of the Cable Ordinance provides that

> the City reserves the additional and separate and distinct power to terminate the Franchise and all rights and privileges of the Grantee hereunder in any of the following events or for any of the following reasons: . . . (2) Grantee violates the terms and requirements of this Ordinance ….

City of Athens Ordinance No. 88-1030 ("Cable Ordinance") § 20(C)(2).  Paragraph 11 of the Pole Attachment Agreement provides that

> [i]f the Licensee shall fail to comply with any of the provisions of the agreement including the specifications hereinbefore referred to, or default in any of its obligations under this agreement and shall fail within thirty days after written notice from Licensor to correct such default or

> non-compliance, Licensor may, at its option, forthwith terminate this agreement.

Pole Attachment Agreement, dated June 15, 1965, ¶ 11.

Charter moves for summary judgment on the ground that the City is estopped from claiming that Charter's alleged violations of the NEC and the NESC constitute violations of the Cable Ordinance and the Pole Attachment Agreement because it waived its right to demand compliance with those safety standards. The court already has rejected this argument. Accordingly, Charter's motion for summary judgment as to the City's fourth request for declaration must be DENIED.

## CONCLUSION

Based upon the foregoing, the City of Athens' motion for summary judgment is due to be GRANTED as to Counterclaims I, II, IV, VI, VII, and VIII, GRANTED IN PART and DENIED IN PART as to Counterclaim III, and otherwise DENIED. Charter's motion for summary judgment on its Counterclaims I–VIII is due to be DENIED. Charter's motion for summary judgment on the City of Athens' First through Fourth requests for a declaration is due to be DENIED. A separate order will be entered.

**DONE** and **ORDERED** this 7th day of July, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

60